Common Pleas Court of Hamilton County.

ROBERT N. GORMAN, PROSECUTING ATTORNEY OF HAMILTON COUNTY, OHIO, ON BEHALF OF THE STATE OF OHIO V. EDGAR FRIEDLANDER, COUNTY TREASURER ET AL.

Decided August 22, 1932.

*Gilbert Bettman,* attorney general, *C. F. Laylin, Raymond J. Kunkel, William J. Ford,* assistants to attorney general, for defendant, Joseph T. Tracy, for demurrers and motions to dissolve.

*Clifford F. Cordes,* for defendants, Edgar Friedlander, county treasurer, and Robert Heuck, county auditor.

*Morison R. Waite* and *Washington T. Porter,* attorneys for intervening petitioner, the Cincinnati Public Library and *Amici Curiae.*

*Robert N. Gorman,* prosecuting attorney for Hamilton County, *Jack Josselson,* assistant prosecuting attorney, *Contra.*

SHOOK, J.

### FACTS APPARENT OF RECORD.

The Prosecuting Attorney of this county, Hon. Robert N. Gorman, has come into this court by petition to restrain the County Treasurer and County Auditor of this county from honoring any warrants drawn upon them by the Auditor of State under the provisions of Sections 6, 7, and 8 of Amended Senate Bill No. 323, commonly known as the "Intangible Tax Law." The petition states that the warrant of said auditor will be in the sum of $722,888.73; the petition was evidently filed before the state auditor had collected all of the data necessary, because it is conceded that the contemplated warrant to be drawn upon these defendants by the Auditor of State is $763,726.46; furthermore, the net amount collected by the defendant Edgar Friedlander, Treasurer, is $1,776,847.83. The petition likewise varies from this amount. In no way do these inaccuracies change the legal phases of this case, so that plaintiff is given leave to amend his petition to conform to the conceded figures, both as to amounts already mentioned, and those referred to hereafter.

On June 8, 1932, the petition was filed, and on that date Judge Stanley Matthews, of this court, granted a temporary restraining order enjoining the honoring of any such warrant, which order is still in full force and effect.

On July 5, 1932, the Attorney General of this state appeared on behalf of the State Auditor, who was made a party defendant, and filed a demurrer to the petition on the ground that the said petition does not state a cause of action against Edgar Friedlander, County Treasurer and Robert Heuck, County Auditor, or either of them, and for the further reason that the petition does not state facts sufficient in law to entitle plaintiff to the relief sought by him in this case. A motion to dissolve the temporary restraining order heretofore issued by Judge Matthews was also filed on substantially the same grounds.

The County Treasurer and County Auditor joined with the Attorney General and filed the same Demurrers and motions to dissolve.

It being an elementary principle of law that a demurrer admits the facts set forth in the petition, we deem it necessary to outline these facts substantially.

The petition states that the Eighty-Ninth General Assembly of Ohio in June, 1931, adopted what is known as the Amended Senate Bill, No. 323, commonly known as the "Intangible Tax Law" which was duly approved by the Governor and became effective as a law on June 30, 1931. That said law repealed certain former sections of the taxation laws, and enacted or amended in whole, or in part, other sections of the Ohio General Code, which sections are set forth in the petition, and which are too voluminous to include in this opinion; that together with the enumerated sections of the General Code were enacted nine separate sections as a schedule, all being part of said law; that said law is in full force and effect· with the exception of an amendment made by Amended Senate Bill No. 8, passed in special session on March 31, 1932, and approved by the Governor April 1, 1932; that taxes were assessed, levied

and collected under said law; that prior to the first day of February, 1932, defendant Robert Heuck, in accordance with Section 6 of said "Intangible Tax Law", computed the amount of undivided classified property taxes due in 1932 to all the municipalities, school districts, public library trustees and park boards, and transmitted a certificate thereof to the Auditor of State. The total amount as shown therein is conceded to be $3,356,273.72. That on and after February 15, 1932, property tax returns were filed by the residents of Hamilton County with the defendant Robert Heuck, and taxes due thereon were paid to the defendant Edgar Friedlander; that if all the undivided property taxes estimated and expected to be collected, in Ohio were collected, Hamilton County would be entitled to receive one-half of the amount contained in said certificate, or $1,678,136.86 at the time of the May settlement, and the other half at the time of the November settlement.

As stated above, the said defendant, Edgar Friedlander, actually has collected from the taxpayers of this county more than the necessary one-half of the proportionate share of Hamilton County by the sum of $98,710.97.

Plaintiff further says that if a similar percentage of collection had been made in all the other counties of the state combined, that the County Treasurer of Hamilton County could retain $1,678,136.86; and that the Treasurer would be obliged to retain this excess; distribution of which would be held subject to further legislation. By reason of the fact that less has been collected in all the other eighty-seven counties of Ohio than was estimated and anticipated, only the sum of $1,013,121.37, amounting to approximately sixty per cent of the estimate of the county auditor, could be used and retained by this county's political subdivisions, and the balance of $763,726.46 would be paid into the state treasury and thence disbursed to political subdivisions of the state for the support and expenses, and to pay the bonded indebtedness of those subdivisions

including cities, villages, school districts, townships and libraries, none of which are in Hamilton County.

Plaintiff claims that said distribution is grossly un-just and discriminatory in that it would compel the taxpayers of Hamilton County to pay out of taxes levied on their personal property situated in Hamilton County, the taxes of many other subdivisions of the State, and said distribution would not merely result in a slight or negligible difference, but in a flagrant taking of property and an unfair and arbitrary discrimination without due process of law and out of all measure with justice and fairness. The amount to be distributed in other counties, if this law is in force, would amount to $1,500,000., for the entire year of 1932.

Plaintiff states that under the provisions of Section 7 it is the duty of the Auditor of State to draw his warrant on the defendant Edgar Friedlander in favor of the Treasurer of State of the amount by which the tax collections in Hamilton County exceeded the quota allotted to it, and that the defendants as County Auditor and County Treasurer will honor said warrant unless restrained by the court from so doing, and that if said warrant is honored irreparable damage will result to the County of Hamilton and the taxpayers thereof.

Plaintiff recites further that Sections 5, 6, 7, and 8 of said Amended Senate Bill No. 323, are void and contrary to the following constitutional provisions: Ohio Constitution, Article 1, section 1; Article II, section 26; Article VIII, section 5; Article X, sections 5 and 7; Article XII, sections 4, 5, and 11; and the United States Constitution, Article XIV, section 1 of the Amendments.

It was upon these representations in the petition, and the further claim therein that plaintiff has no adequate remedy at law that Judge Matthews granted the temporary restraining order.

### THE QUESTION INVOLVED.

We are not, in this case, called upon to determine the validity of the general levy nor is there any such issue made in this case by the petition and the de-

murrers and the motions filed herein. The sole question to be determined is whether or not the distribution sections 6, 7, and 8 of said Amended Senate Bill No. 323, known as "The Intangible Act" are invalid and void because they are contrary to the provisions of the United States Constitution and the Constitution of Ohio, set forth in the petition, or any of them. We find that section 5 referred to in the petition is not germane to the issue.

The validity of the levy of taxes on intangible tax property in Hamilton County and else-where in the state under this act has been upheld in *The State of Ohio on Relation of E. C. Lampson, Jefferson, Ohio, Plaintiff,* v. *W. H. Cook, as Auditor of Ashtabula County, Ohio, et al, Defendants.* This case was decided April 8, 1932, by the Court of Appeals sitting in Ashtabula County.

## THE RIGHT OF THE PROSECUTING ATTORNEY TO FILE THIS ACTION.

We must first determine, however, whether or not the Prosecuting Attorney has authority to bring this action, this right being questioned by the Attorney General.

We find that not only has the prosecutor the right, but it was his duty, to file this action as Prosecuting Attorney of Hamilton County on behalf of the State of Ohio, by reason of *Section* 2921 *General Code.*

## AUTHORITY FOR THIS LEGISLATION.

The authority for the passage of these sections was given by the people of the state of Ohio at the November, 1929, election, at which time they voted to amend Article XII, section 2 of the Ohio Constitution, and to repeal the original sections 2 and 3 of Article XII of the Ohio Constitution. It is important to note that the original Article XII, section 2, of the Ohio Constitution authorized the legislature to pass laws taxing by a uniform rule all moneys, credits, investments in bonds, stocks, joint stock company, or otherwise, and also all real and personal property according to its true value in money, with certain exceptions and exemptions.

The pertinent portion of the amendment to Article XII, section 2, of the Constitution of Ohio, reads:

"No property, taxed according to value, shall be so taxed in excess of one and one-half per cent of its true value in money for all state and local purposes, but laws may be passed authorizing additional taxes to be levied outside of such limitation, either when approved by at least a majority of the electors of the taxing district voting on such proposition, or when provided for by the charter of a municipal corporation. Land and improvement thereon shall be taxed by uniform rule according to value, etc."

There are also certain exceptions and exemptions in this amendment.

The effect of the amendment to Article XII, section 2, of the Ohio Constitution was to abolish the uniform rule in taxation and to authorize the legislature to provide for a classified property tax on subjects other than real estate. The Eighty-Ninth General Assembly enacted Senate Bill No. 323, pursuant to the authority given by the people in adopting this amendment to the Ohio Constitution. By this Act the old general personal property tax was abolished and in place thereof an intangible tax was adopted. Section 5638 General Code states the classification of intangible property and rate of taxation, as follows:

"For the purpose of the general revenues of the municipal corporations, school districts and special taxing districts in this state, and to lessen the burden of general taxation on real property, taxes are hereby levied on the kinds and classes of intangible property, hereinafter enumerated, on the grand classified tax list and duplicate of the state of Ohio at the following rates, to-wit: investments, five per centum of income yield; unproductive investments, two mills on the dollar; deposits, two mills on the dollar; shares in and capital employed by financial institutions, two mills on the dollar; share in and capital employed by dealers in intangibles, five mills on the dollar; capital and surplus of domestic insurance companies, five mills on the dollar, and moneys, credits and all other taxable intangibles so listed, three mills on the dollar."

Section 5376 General Code makes the county audi-

tor the deputy of the State Tax Commission in the assessment of these taxes.

The result of the tax assessments under this Act are still in the custody of the treasurers of the eighty-eight different counties of this state, no distribution of these tax proceeds as yet having been made.

## CONTENT OF SECTIONS SIX, SEVEN, AND EIGHT.

Directing our attention to sections 6, 7, and 8, the distribution sections of this law, we find that the proceeds of the tax levy under Section 5638 General Code are to be distributed in the years 1932 and 1933. (Vol. 114 Laws of Ohio, pp 779-783.)

Section 6 requires the county auditor of each county to compute the amount of undivided classified property taxes due to each municipal corporation, school district, board of public library trustees, park district, sanitary district, and township park district in his county, according to the distribution of said taxes as provided by this section.

Each municipal corporation, school district, park district and sanitary district are to receive from the intangible tax funds, by the terms of section 6, what they lose by taking off of the general tax fund, "an amount equal to the proceeds of a tax at the aggregate rate levied for all the purposes of such municipal corporation (including levies for municipal universities and other municipal institutions), school district, sanitary district or park district in the year 1930 upon the motor vehicles, household goods and furnishings, pianos and musical instruments, moneys, credits, investments in stocks, bonds, joint stock companies or otherwise, and shares of bank stock or capital employed in banking, as listed and assessed for taxation in such municipal corporation or school district or part thereof, or any such park district, on the duplicate of taxable property in the county for the year 1930."

The last clause of section 6, reads:

"In preparing the tax budget for the years 1932 and 1933, under Section 5625-20 of the General Code, the taxing

authorities of each subdivision shall estimate that said subdivision will receive from the intangible tax fund the full amount to which such subdivision is entitled under the provisions of this section, to be apportioned among the several funds, including funds for the payment of interest, sinking fund and retirement charges on bonds, in accordance with the provisions of this act."

Section 7, provides that after the first half year's collection, the auditor of state ascertains from the county auditors, from the certificates of the May settlement with the County Treasurers, the aggregate net amount of such taxes received in each county. After deducting the state's share thereof (which according to section 6 is one per cent for administration purposes) and the fees of the auditor and treasurer, the state auditor then must determine the grand total collected in all the counties. The Auditor of State then draws his warrant on the County Treasurer of any County in which the net amounts of such taxes collected exceeds such county's proportionate share for the amount of such excess. Such amount shall be paid into the State Treasury. At the same time, the state auditor must draw a warrant on the treasurer of state in favor of the treasurer of any county in which the net amount of said taxes so received, as shown by the certificate thereof, is less than the county's proportionate share of such taxes, for the net amount of such deficiency.

Under Section 8 the state auditor must ascertain the aggregate net amount of undivided classified property taxes received and collected in each county, after deducting the state's share thereof, the fees of the auditor and treasurer, and adjustments provided in section 7. This must be done upon receiving the duplicate certificate transmitted to him in the October settlement of the years 1932 and 1933. He must also ascertain whether the gross aggregate amount (for each entire year) · collected in all of the counties exceeds the gross aggregate amount of the distributable shares of all the municipal corporations, school districts, board of public library trustees, park districts, sanitary districts and township

park districts in the state as shown by the certificate previously filed with him.

Section 8 then provides:

"If such amount so collected is less than the aggregate amount of such distributable shares, the deficiencies so ascertained shall be divided among the several counties in proportion to such distributable shares, and the amount of such deficiency so appropriated to each county shall be subtracted from the aggregate distributable shares for each county."

## RESULT OF APPLICATION OF SECTIONS SIX, SEVEN, AND EIGHT.

Sections 6, 7, and 8 must be construed in *pari materia*. By these sections if the total amount collected throughout the state were equal to the estimate, then each subdivision would be entitled to its full estimate regardless of the amount collected in the particular county. If there is a shortage, then each county must bear its proportionate share of the shortage. This would be true even if one county would collect more than one hundred per cent and another but fifty per cent of its estimate. After the percentage is determined by the State Auditor, he thereupon is required to draw his warrant on each county treasurer in any county where the amount collected is in excess over such percentage arrived at. Thereupon the state auditor then issues his warrant to the counties which did not collect the amount of the percentage so determined, so as to provide to such counties the amount of their percentage. This method of distribution under sections 6, 7, and 8 resulted in a draft on the county treasurer in fifteen counties in the total amount of $1,098,425.98, which amount is distributed in the manner stated above among the remaining seventy-three counties. The average net amount collected throughout the eighty-eight counties for the first period of collection was approximately sixty-five per cent of the quota, whereas, Hamilton County collected more than one hundred per cent of its quota. The fifteen counties being called upon to contribute certain proportions of their levies to the other seventy-three counties are the following:

Allen, Ashland, Butler, Clermont, Coshocton, Erie, Franklin, Geauga, Hamilton, Jefferson, Lake, Muskingum, Ottawa, Richland and Wyandot.

Franklin County is called upon to pay to the other counties, according to this distribution, $199,402.32. The total distributable share in Franklin County is $1,029,-898.56. Its quota, therefore, for the first collection period was $514,949.28. The net amount collected was $510,286.45. Under this method of distribution the proportionate share allotted Franklin County is $310,-884.13. In other words, the taxpayers of Franklin County having paid to their duly authorized agents almost one hundred per cent of their proportionate share, must pay out under this method of distribution to other counties approximately forty per cent of the net amount collected. Hamilton County having collected approximately one hundred and five per cent of its quota is allowed to retain approximately sixty per cent of the amount collected and must allow the balance to be distributed among these several counties.

One of the counties having collected $8,314.42, its proportionate share being $15,640.34, is having returned to it $7,324.92, or almost one hundred per cent of the amount collected. Another county collected $17,313.18, and is to get back $11,487.87. Cuyahoga County under this method of distribution is to be paid back the sum of $39,428.61.

It will be seen from the foregoing rather prolix outline that this method of distribution is apt to encourage laxness among law officials in the performance of their duties, and to discourage the vigilant and efficient public servants. While taxation is a vital necessity of citizenship, it is a well known fact that most people chafe under this obligation, hence the necessity for just and fair distribution under any taxation system.

We must bear in mind the evident knowledge on the part of the legislature that there would always be deficiencies under this plan, no matter how conscientious and efficient the local authorities in each county might be. In other words, the legislature provided for this

sort of an emergency in these distribution sections. However, regardless of the unfairness in which the distribution features of this Act have worked out in practical operation; regardless also of public sentiment in those communities where large proportions of local collections are being paid to other communities (which includes the county of Hamilton where this court is sitting,) we realize that the validity of this Act, by which we mean, of course, the distribution features thereof, must be decided by constitutional standards and none other.

### Do Sections Six, Seven, and Eight, of This Act Violate Any of the Constitutional Provisions Set Forth in Plaintiff's Petition?

*Plaintiff claims that this is purely a local tax and that therefore, the proceeds thereof must be used in the county where the tax is collected.*

*The Attorney General claims that this is a state tax to be used for public purposes and therefore, the tax may be distributed as provided in the sections under consideration.*

We have given the utmost attention to the excellent and exhaustive briefs filed with the court by eminent counsel on both sides of this question. Necessarily, much time has been consumed in the reading and analyzing of all of the authorities cited, together with many others, in attempting to arrive at the correct solution of this tremendously important public question. We fully realize this decision affects not only Hamilton County, but all other counties in Ohio.

Of course, if the prosecutor is correct, the demurrer to the petition must be overruled; if the Attorney General is correct, the demurrer must be sustained.

This question before us is one of first impression in Ohio, so that we must be guided by the application of general principles expressed in what appear to be some what analogous cases.

That the distribution features of this Act can be decided separate and apart from the validity of the levy is well established.

*Cooley on Taxation* (*4th Ed.*) *section* 1813, reads:

"After taxes have been collected, their apportionment and distribution is largely regulated by statute. Distribution is separate from and independent of the levy of the tax, so that the validity or invalidity of the former does not affect the latter. * * *"

The same principle is enunciated by our Supreme Court in the case of *State ex rel.*, v. *Edmondson*, 89 O. S., 93, in the following concluding language of the opinion, at page 114:

"If perchance other laws in relation to the disbursement of the fund so raised, for the purpose for which it was levied, are unconstitutional, nevertheless the levy must 'stand, leaving it to the legislature to provide constitutional ways and means by which the fund may be applied to the object named in the statutes. The act of the general assembly levying this tax is a valid and constitutional exercise of the authority of the general assembly of Ohio to provide revenue for state purposes."

In passing upon the constitutionality of these sections there are certain cardinal principles of construction which must and will be adhered to strictly by this court.

The general rule that an Act of Congress in conflict with the Constitution is void was first decided in this country in the epochal opinion of the great Chief Justice John Marshall, in 1803, in the case of *William Marbury* v. *James Madison, Secretary of the United States,* 1 *Cranch's Report,* 137. This rule has been universally followed ever since by all courts, not only with reference to conflict between Acts of Congress and the Constitution of the United States, but in conflict of State laws with the State Constitutions.

Judge Jones writing the opinion for the Supreme Court in the case of *State ex rel., Ach,* v. *Braden,* 125 O. S., at *page* 310, expresses the rule in Ohio thus:

"But in determining the constitutionality of the act, we are bound by that canon of statutory construction, frequently adhered to by this court, that only where there appears to be a clear incompatibility between the Constitu-

tion and the law will the law be declared to be void and the judicial branch of the government refuse to execute it."

See also *Saviers* v. *Smith*, 101 O. S. 132, at page 138; Vol. 8, Ohio Jurisprudence, page 140, Section 39.

In determining whether or not these sections of the Intangible Tax Law under discussion are in conflict with any of the provisions of the United States or Ohio State Constitutions, we must first of all ascertain from the Ohio Constitution the taxing power of the General Assembly. There is no express power of taxation conferred upon the General Assembly of this state. The power of taxation, however, is an attribute of sovereignty and is included in the general legislative power conferred by section 1, Article II of the Constitution.

See: *Saviers* v. *Smith*, 101 O. S., 132; *State ex rel, Walton*, v. *Edmondson*, 89 O. S., 351; *Baker* v. *Cincinnati*, 11 O. S., 534; *Southern Gum Co.*, v. *Laylin*, 66 O. S., 578; *State ex rel., Bryant*, v. *Akron Metropolitan Park District for Summit County, et al.*, 120 O. S. 464.

In the case of *State ex. rel.*, v. *Park District*, 120 O. S. supra., at page 480, is found the following conclusive language:

"The power of the state to levy and collect taxes for public purposes is indispensable to orderly government, and is inherent in sovereignty. No government could discharge its functions without funds, and funds can only be raised by the imposition of taxes. The exercise of the power of imposing and collecting taxes is legislative, and yet this power is not expressly conferred by our Constitution upon the General Assembly. It is, however, necessarily included in the legislative authority conferred upon the General Assembly by Sec. 1 of Article II of the Constitution. Except for other express and implied provisions in the Constitution, the power of taxation would be vested in the Legislature alone, and without interference on the part of other governmental agencies."

Other pertinent provisions in the Constitution are quoted at page 481:

"Article VI, Section 2: "The General Assembly shall make such provisions by taxation, or otherwise, as, with

rthe income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state.

Article X, Section 7: The commissioners of counties, the trustees of townships, and similar boards, shall have such power of local taxation, for police purposes, as may be prescribed by law." Article XII, Section 5: "No tax shall be levied, except in pursuance of law; and every law imposing a tax, shall state, distinctly, the object of the same, to which only, it shall be applied." Article XIII, Section 6: "The General Assembly shall provide for the organization of cities, and incorporated villages, by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power."

As to whether or not the distribution sections relate to purely local purposes, the intention of the legislature is apparent from the concluding paragraph of section 6, in which the taxing authorities of each subdivision in preparing the tax budget for the years 1932 and 1933 under Section 5625-20 of the General Code shall estimate; first, that said subdivision will receive from the Intangible Tax Fund the full amount to which said subdivision is entitled under the provisions of this section; second, that said amount is to be · apportioned among the several funds, including funds for the payment of interest, sinking fund, and retirement charges on bonds, in accordance with the provisions of said section.

By referring to other portions of this section we find that the municipal corporations, school districts, park districts, and sanitary districts in the county shall be given an amount equal to the proceeds of a tax at the aggregate rate in the year 1930 upon motor vehicles, household goods and furnishings, etc.

Furthermore, Section 5638, General Code, states that taxes are to be levied on intangible property enumerated in this Act, "for the purpose of the general revenues of the municipal corporations, etc." This language is clear and unambiguous.

Our attention has been called to the form of budget prescribed by the State Bureau of Accounting and In-

spection of Public Offices, which shows that these purposes (with some exceptions) are common to all municipal corporations in this state.

The 1932 budget of the City of Cincinnati out of its General Fund pays salaries of council, expenses of the office of the city auditor and treasurer and solicitor, the city civil service commission, the municipal court, court clerk, city manager, including his salary and office expenses, department of safety administration, police and fire department, the building department, public utilities, sanitary department, public health and nursing, sewer department, garbage removal, incinerator, workhouse, public baths, etc. Further the City of Cincinnati has issued bonds for the following and many other purposes: Cincinnati Southern Railway Construction and terminal, City Hall, Airport, grade crossing, subway and viaducts, public landings, public library, rapid transit, sewers, streets, university, etc.

To reverse the situation, let us assume that Cuyahoga County instead of getting back forty thousand dollars approximately, would be paying out over seven hundred thousand dollars, of which this county would get a proportion. Can it be successfully argued, by any force of logic or reasoning, that in the application of these funds (which had been levied for the same sort of local purposes), Hamilton County could legally be given the money of Cuyahoga County in order to maintain the sort of necessary local municipal service to which attention has been called *supra*. The only portion of the proceeds allotted to the state are found in section 6:

"To the state of Ohio one per centum thereof, which, when paid into the state treasury in the manner provided by law, shall constitute a fund for the use of the tax commission of Ohio in putting into effect and administering the system for the assessment of tangible and intangible personal property created by this act and shall not be used or appropriated for any other purpose."

The Attorney General has called our attention to a number of instances in which the legislature has imposed different kinds of excise taxes in part for the use of the state, and in part for the use of the several

subdivisions of the state, such as municipal corporations, counties and townships. We must bear in mind at all times the distinction between excise or license tax, and property tax. The sections in the Intangible Tax Law under consideration refer strictly to property, and not to excise tax.

The automobile license tax, to which our attention is first directed, is distributed under Section 6309-2 G. C.

The proportion of this particular tax to be turned over to the municipal corporation, or county, within designated districts, is to be used "for the maintenance and repair of public roads and highways, and for no other purpose, and shall not be subject to transfer to any other fund."

The case of *Fisher Bros. Co.*, v. *Brown*, 111 O. S., 602, is authority for upholding the validity of this sort of distribution, for the reason that the maintenance of roadways and highways are a state function. The roads and highways maintained by this fund are for the use of the public generally, regardless of the place of residence. In these days of rapid transit, the citizens of our county will frequently traverse highways connecting with other counties of this state, and citizens of all other counties have the same reciprocal rights.

The state excise tax on the sale and use of motor vehicle fuel, the proceeds of which are distributed to the state, counties, municipal corporations, and townships, (Sec. 5527, *et seq.*, Sec. 5541-1, *et seq.*, General Code) comes within the same principle.

The inheritence tax on the right and privilege as heirs, devisees and legatees to succeed to property on the death of the owner thereof, the proceeds of which tax go in part to the state, and in part to the municipal corporation or township in which the law originated (Sec. 5332, *et seq.*, General Code) is distributed by authority of Section 9, Article XII of the State Constitution.

But suppose the legislature should attempt to proportion among the different counties, (according to the

scheme in the instant case,) the said minimum of fifty per cent, which the Constitution states must remain in the county, school district, city, village or township in which said income originated. We take it, it will be conceded that the state would not have this power.

The cigarette sales tax law on the business of trafficking in cigarettes, (Sec. 5894-2, *et seq.*, General Code), which is to be used "for the purpose of affording the advantage of a free education to all youth of the state, etc," may be construed in connection with the interpretation placed upon Sec. 7575 General Code by our Supreme Court. This latter section provides a tax to be levied for county schools, as stated, "for the purpose of affording the advantage of a free education to all youth of the state."

In the case of *Miller* v. *Korns*, 107 O. S., 287, in construing Section 7575 General Code, it was held that under section 2, Article VI, of the Ohio Constitution, it is mandatory that the General Assembly make such provisions by taxation or otherwise, so as to secure a thorough and efficient system of common schools throughout the state. That, therefore, the proportion by the legislature of funds raised in one school district for the needs of other school districts, is made in pursuance of a legitimate state purpose, and not for any purpose of a local or private nature.

The case of *State, ex rel.,* v. *Edmondson*, 89 O. S., 93, is illuminating. The matter before the Supreme Court was the validity of an Act of the General Assembly; passed April 8, 1913, approved April 15, 1913, (103 O. L., pp 155-58.) entitled "An Act creating a state highway department, etc." Judge Donahue writing the opinion (p. 110,) uses the following language:

"The right of the general assembly to levy this tax for state purposes depends upon whether the purpose of the levy are state purposes. That the state has the power to build and maintain highways seems never to have been doubted in Ohio."

Furthermore, Article XII, Section 10, of the State Constitution provides for excise and franchise taxes,

which is authority for the levying of the excise tax for the maintenance of a public highway system in this state.

In the case of *State ex rel.,* v. *W. C. Benham,* 17 O. C. C. Reports, (N. S.) 179, section 8 of the so-called "needy blind relief fund" (103 O. L. 833) was declared invalid, although the Act in its entirety was upheld. Section 8 reads:

"After the passage of this act, and on the demand of the state treasurer, the treasurer of the respective counties shall transfer and pay over to the state treasurer all moneys in their possession or that may thereafter come into their possession under present levies for the relief of the blind."

On page 181, the court finds:

"This clause of Section 8 is therefore in conflict with Section 5 of Article XII of the Constitution, which provides:

"No tax shall be levied except in pursuance of law, and every act imposing a tax shall state distinctly the object of the same to which only it shall be applied."

The court then says (181):

"It is contended that at least the surplus after the payment of warrants due up to the time of the taking effect of the state act should be paid into the state treasury for administration under the state act. We are not without doubt upon this feature, but after careful consideration we have reached the conclusion that under the constitutional provision above quoted even the surplus can not be transferred to the state treasury, but must be retained in the county treasury to go to the general revenue fund for other county purposes to which it may be transferred under laws existing at the time the levies were made."

This case was taken on error to the Supreme Court. See: *State of Ohio, ex rel., John Brennan, Treasurer of State,* v. *Benham, Treasurer of Franklin County,* 89 O. S. 351.

The case of *State ex rel., Walton,* v. *Edmondson, Auditor of Hamilton County,* involved the same question, and was presented in the Supreme Court together with the

Brennan case; The Circuit Court of Franklin County in the Brennan case, *supra.*, (17 C. C. (N.S.) 179) was affirmed by the Supreme Court. By the same opinion the Circuit Court of Hamilton County was reversed and judgment entered for plaintiff in error. The basis for the reversal of the Circuit Court of Hamilton County is unimportant. On page 364, the Supreme Court says:

"The portion of Section 8 of the law of 1913, above referred to, is in direct conflict with Section 5 of Article XII. Each county of the state has raised a fund of its own under the law of 1908 to be applied for the relief of its own blind. Necessarily the amount and the proportionate amount which each county would raise would be different from each of the other counties, and different from its proportion if originally raised by the state for state purposes. To require that this money should be turned over to the state treasurer and used as a part of a fund which belonged to the entire state to be expended for the purpose of the entire state, although the object would be similar, would produce the very inequality and injustice which the constitution intended to prevent."

See also syllabus 1 in the recent case of *Board of Education* v. *County Board of Education,* 26 N. P. (N. S.) 33.

While the foregoing authorities are not exactly in point, by analogy, they disclose that in Ohio the legislature can not order distribution of funds levied for local purposes to either the state treasury or to another county for local purposes.

*Cooley on Taxation* (Vol 4, 4th Ed.,) 3565, section 1817, says:

"* * * The state not only confers upon its counties, towns, cities, and villages such powers to tax as they possess, but it may to a large extent take to itself the control and disposition of funds collected, though in doing so it should keep in view the general purposes for which the funds have been called for from the people, as a guide in the expenditure provided for. And if municipal powers are taken away, the municipal property, including its tax moneys, collected and uncollected, passes to the state, to be treated as a trust, and managed and disposed of for the benefit of the local community.

The concluding paragraph of section 1817 in the same volume pp 3569-3570 is decisive of this question:

"* * * the rule supported by later decisions is that while the state, unless prohibited by the constitution, may regulate the disposition of county or municipal or other tax district funds raised by taxation, except as such revenues may, by the constitution or by the law creating them, be devoted to special purposes, even in some cases to the extent of applying to a different purpose such taxes so collected, it is settled that local taxes collected by one tax district cannot be applied for the benefit of another tax district."

## THE CASE OF AMOS ET AL V. MATTHEWS, 99 Fla. 1.

The case of *Amos, et al., v. Matthews,* 99 Fla. Reports, page 1, is cited by the Prosecuting Attorney as decisive. In this case, decided January 23, 1930, the Supreme Court of Florida handed down an unusually lengthy opinion (130 pages). The constitutionality of the second and third gas tax which has been levied by the state (as excise taxes) had been attacked. The second tax was to be distributed to the several counties in proportion to the amounts collected in each county. The third tax was to be distributed among the several counties in the proportion which the bonded indebtedness of such county for roads and bridges bears to the bonded indebtedness of like nature in all of the counties. The proceeds of the second and third gasoline taxes were to be applied to the payment of existing bonded indebtedness of the several counties for the building of public roads and bridges for which bonds had been issued.

The act provided that the proceeds of the second and third gasoline taxes were to be collected under the supervision of the state comptroller and to be distributed by the state treasurer directly to the paying agencies for the bonds; or to the holders thereof. In other words, the proceeds of the second and third gasoline taxes never reached the hands of the local county officers in making these disbursements, the state treasurer acting as county treasurer, ex officio. This plan was certainly more in harmony with a purely state purpose than the

distribution features of the Intangible Tax Law, which we are considering.

The sole question in the Florida case was whether or not the second and third taxes were levied as state or county taxes. (Page 19.)

On page 20, is quoted section 2 of Article IX of the Florida Constitution, as follows:

"The Legislature shall provide for raising revenues sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal interest of the existing indebtedness of the State."

On page 21, the court holds that this provision is a limitation on the power of the legislature to levy taxes, quoting from *Cheney* v. *Jones*, 14 Fla., 587.

It is important to quote Article XII, Section 4 of the Ohio Constitution, which is similar to Section 2, of Article IX of the Florida Constitution, *supra*:

"The General Assembly shall provide for the raising of revenue, sufficient to defray the expenses of the state, for each year, and also a sufficient sum to pay the interest on the state debt."

However, we agree with the construction of the Attorney General with reference to section 4, Article XII, of the Ohio Constitution, that this constitutional provision does not limit the power of the General Assembly to levy taxes other than for its own expenses and revenue. The limitations upon the taxing power of the General Assembly in Ohio are those expressed in Article VI, Section 2; Article X, Section 7; Article XII, section 5; and Article XIII, section 6.

While the general reasoning of the court in the Florida case is unduly long and involved, there can be no doubt about the law as expressed in the following syllabi:

Syl. 19. "The legislature may "provide" for levying excise taxes either by a direct imposition thereof or by delegated authority to local officers to levy such tax for a local purpose.

Syl. 20. The second and third gas taxes levied by Chap. 14575, Acts of 1929, being excise taxes, since these taxes may be regarded as county taxes for county pur-

poses, the levy of said second and third gas taxes as county taxes is valid under Sec. 5 of Article 9 of the Constitution.

Syl. 21. The legislature has wide, if not plenary, discretion in the opportionment and application of the proceeds of a State tax, except as restrained by the Constitution.

Syl. 22. Intrinsic equality and uniformity, essential in the imposition of *ad valorem* taxes, is not indispensable in the imposition of excise taxes. Nevertheless, in the imposition of excise taxes there must be geographic uniformity throughout the taxing district to which the particular tax applies, and such a tax can neither be laid nor apportioned amongst different taxing districts so as to in effect tax the people of one taxing district for the benefit of another taxing district for a purpose in which the people of the district taxed have no concern.

Syl. 24. Even though the legislature may impose excise taxes for county purposes, it can not take the revenue thus raised in one county for county purposes and appropriate it to pay the debts of some other county, upon the assumption that as the revenue is public funds raised by Act of the legislature itself, it must be at the absolute disposal of the legislature.

Syl. 26. Even though the levy of a county excise tax is laid uniformly by the legislature, if the proceeds of the tax are arbitrarily apportioned without reference to the sums collected in the taxing units in and for the benefit of which the taxes are levied and collected (in this case the several counties), the result is as much a denial of uniformity and equal protection of the law as though the levy itself was similarly lacking in uniformity."

While we can not apply in part the constitutional construction of the Florida Supreme Court to the Ohio Constitution; further, while the nature of the taxes involved is different, nevertheless, we accept this case as authority for the proposition that the legislature is without constitutional authority to take from the several counties local taxes and distribute them among other counties for strictly local purposes.

THE CASE OF DUFFY, ET AL., v. TREASURER, 234 Mass., 42.

On the other hand, the Attorney General cites the case of *Duffy et al.*, v. *Treasurer*, 234 Mass. Reports, 42, as decisive.

This was an action to test the constitutionality of St. 1919, ch. 314. That Act provides for the distribution among the several cities, towns and taxing districts, of the income collected by the commonwealth under provisions of St. 1916, ch. 269, and Acts in amendment thereof, enacted pursuant to Art. XLIV of the Amendments to the Constitution.

Amendment XLIV to the Constitution reads:

"Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the commonwealth upon incomes derived from the same class of property. The general court may tax income not derived from property at a lower rate than income derived from property, and may grant reasonable exemptions and abatements. Any class of property the income from which is taxed under the provisions of this article may be exempted from the imposition and levying of proportional and reasonable assessments, rates and taxes as at present authorized by the constitution. This article shall not be construed to limit the power of the general court to impose and levy reasonable duties and excises."

Now, let us compare this with the Ohio Constitution giving authority to the General Assembly to pass an income tax; Article XII, Section 8:

"Laws may be passed providing for the taxation of incomes, and such taxation may be either uniform or graduated, and may be applied to such incomes as may be designated by law; but a part of each annual income not exceeding three thousand dollars may be exempt from such taxation."

As to the distribution thereof, Article XII, Section 9, reads:

"Not less than fifty per centum of the income and inheritance taxes that may be collected by the state shall be returned to the county, school district, city, village, or township in which said income or inheritance tax originates, or to any of the same, as may be provided by law."

On page 48 of the Massachusetts' case, *supra,* we read:

"The objection mainly urged against the constitutionality of St. 1919, c. 314, relates to the method of distribution of the income tax, when collected, among the cities and towns and taxing districts of the commonwealth."

The following statement is contained on page 49:

"The income tax, however, has yielded a revenue much larger than is required to make good these losses."

The distribution feature of the income tax is stated on page 49:

"The State tax is assessed now upon the several municipalities in proportion to the valuation of the real estate and of the tangible personal property in each, omitting all consideration of intangible personal property owned by the inhabitants of each. The distribution of the income tax confessedly is not made to the municipalities on the footing of the amount of income tax collected from their inhabitants. That factor is ignored. The design of the statute is that the income tax shall be collected at large throughout the Commonwealth and distributed to the municipalities in ratio to the valuation of all the property therein now made subject to taxation according to Ch. 1, Sec. 1, Art. 4, of the Constitution, requiring proportional and reasonable taxes."

On page 53, we read:

"The present statute is a departure in important particulars from any tax law which has hitherto been enacted in this Commonwealth. It seems to go almost to the verge of constitutional power."

See also page 54:

"The income tax is levied by the State equally upon all made subject to the tax, according to valid classifications, for public purposes, and can be expended only for those purposes."

On page 51, we find the following language:

"It is a general principle of law of taxation that the people of one district cannot be taxed for the benefit of another district. *Hampshire* v. *Franklin,* 16 Mass. 76. *Norwich* v. *County Commissioners,* 13 Pick. 60. *Dorgan* v. *Boston,* 12 Allen, 223, 235, 237. *Thomas* v. *Gay,* 169 U. S. 264. *Beach* v. *Bradstreet,* 85 Conn. 344, 357."

In the case of *Dane* v. *Receiver General*, 237 Mass. Reports, page 50, the earlier case of *Duffy* v. *Treasurer and Receiver General, supra.,* and the case of *Dane* v. *Receiver General,* 236 Mass. 280, were affirmed. This case was taken on error proceedings to the United States Supreme Court under the title of *Dane* v. *Jackson, Treasurer,* and *Receiver General,* 256 U. S. Reports, 589, Mr. Justice Clarke writing the opinion. It was argued before the Supreme Court that the inhabitants of one district were taxed for the benefit of the inhabitants of another district and that this violates the due process of law and equal protection of the law clauses of the XIV Amendment to the Constitution of the United States.

On this subject the Supreme Court says, (p. 599):

"* * * it is not within either the disposition or power of this court to revise the necessarily complicated taxing systems of the States for the purpose of attempting to produce what might be thought to be a more just distribution of the burdens of taxation than that arrived at by the state legislatures. (4 Pet. 517; 15 Wall 319; 109 U. S. 400; 185 U. S. 371, *supra*) ; and that where, as here, conflict with federal power is not involved, a state tax will be held to conflict with the Fourteenth Amendment only where it proposes, or clearly results in, such flagrant and palpable inequality between the burden imposed and the benefit received, as to amount to the arbitrary taking of property without compensation—"to spoliation under the guise of exerting the power of taxing. (134 U. S. 237; 173 U. S. 615; 239 U. S. 220, *supra.*)"

In conclusion the Supreme Court (p. 601) states:

"The case presented is clearly not one of that extreme inequality in taxation of which the federal courts should lay hold, but involves rather a question of state policy, of a character which the people have been satisfied to leave to the judgment, patriotism and sense of justice of representatives in their state legislature."

Therefore, the Supreme Court found that the plan of distribution contained in the income tax law of Massachusetts was not in violation of the Fourteenth Amendment to the Constitution. However, the court found that this was a case which involved a question of state policy,

which the people had left to the sound judgment and sense of justice of their state representatives.

We have already called attention to the difference of state policy in Ohio by reason of Article XII, Section 8 and Article XII, Section 9 of the Ohio Constitution.

The above cases are authority for the proposition that mere inequality in distribution of taxation will not invalidate a law, also the fact that because the distribution of the taxes among the several subdivisions is on a different basis than that upon which the collection is made, will not render the statute void unless it is arbitrary and irrational.

The principle that the people of one district can not be taxed for the benefit of another district is followed.

It is argued by the Attorney General herein that in Ohio, as in Massachusetts, county boundary lines have been wiped out, and the state is the taxing district, etc. However, the analysis of Sections 6, 7, and 8, *supra*, prove, to our mind, conclusively that the local subdivisions are the taxing districts.

Neither can we escape the proposition that the people of Ohio have already by constitutional enactment decided upon the policy of distribution of income taxes, so that the local subdivisions are not to receive less than fifty per cent of such income tax. If the legislature of Ohio should pass an income tax law, it would be circumscribed, of course, by this constitutional provision. It would be confronted with an entirely different fundamental principle than was presented to the General Court of Massachusetts in adopting the income tax law, 1916, chapter 269, and amendments thereto. The legislative power as expressed in the Massachusetts Constitution, chapter 1, section 1, paragraph 4, is so entirely different from any constitutional provision in Ohio that there can be no rational comparison.

We, therefore, feel that the policy of the people in the two states are not in harmony as shown by these two state constitutions. Neither is the legislation passed by authority of amendment XLIV to the Massachusetts Constitution applicable in the distribution features thereof

to Sections 6, 7, and 8, under consideration herein. Neither is the amended Article XII, section 2, of the Ohio Constitution in any way similar to amendment XLIV of the Massachusetts Constitution.

We do not disagree with many of the abstract principles of law laid down in the case of *Duffy* v. *Treasurer and Receiver, supra.* There is an attempt here, however, to apply the principles therein enunciated to an entirely different set of circumstances under legislation of an entirely different character. Furthermore, it will be noted that the distribution of the income tax in Massachusetts is made "in ratio to the valuation of all the property remaining, subject to taxation in the several cities, towns and taxing district."

Further, we have the comment under Section 6, of the distinguished chairman of the Senate Committee which drafted and proposed the distribution sections of the Ohio Intangible Tax Law, now under consideration:

"Comment: This section provides for the distribution of intangible taxes in the years 1932 and 1933. It is clearly an arbitrary and temporary method of distribution, and a permanent system will have to be enacted in 1933."

(Comments on The New Intangible Tax Law by Robert A. Taft, of the Cincinnati Bar—The W. H. Anderson Co., Cincinnati, Ohio.)

This expression of legislative purpose is in direct conflict with Syl. 5, in the case of *Duffy* v. *Treasurer and Receiver General*:

"The basis provided by St. 1919, c. 314, of distribution of the income tax among the several cities, towns and taxing districts, while it is different from that on which the collection of that tax is made, is one recognized by law and practice as just for the levying of the State tax, and is not irrational, whimsical or arbitrary."

The distribution features of the Intangible Tax Law of Ohio ignore entirely the varying tax rates in the different municipalities, the amounts to be received being based upon such local rates of 1930. For instance, in

1930, the following were the tax rates in the cities enumerated:

| | |
|---|---:|
| Akron | 28.30 |
| Ashtabula (City School District) | 23.50 |
| Bucyrus | 22.80 |
| Cincinnati | 22.10 |
| Cleveland | 27.15 |
| Columbus | 22.50 |
| Dayton | 25.20 |
| Greenville | 23.60 |
| Portsmouth | 23.20 |
| Steubenville | 18.80 |
| Xenia | 23.50 |
| Zanesville | 21.80 |

(Corporation Tax Service for Ohio, page 329 published by The Corporation Trust Co.)

There is absolutely no uniform basis either with respect to the amount of property located, or to sums collected, in the several taxing subdivisions. In fact, there is no uniform basis whatsoever. If this tax which was levied was to be used for general state purposes, although the collection for such purposes could not be distributed with uniformity throughout the state, a different situation would confront us.

But where the law provides for the raising of taxes for local purposes; where counties having a deficit are given the surplus from counties that have raised more than their quota, to be used for local purposes, the only rational deduction is, that this is a plan by which one community is taxed for the local purposes of another. Furthermore, where the state is levying taxes, the distribution must be upon some reasonable basis, which does not result under this system. The different municipalities are taxed in 1932 by the 1930 tax rates, so that, for illustration, the tax rate of Akron at $28.30 is in part the basis for the distribution of Cincinnati's 1932 collection. The basis under Sections 6, 7, and 8, is a percentage of the value of personal property determined by each municipality itself in 1930. This demonstrates that this system of distribution is purely arbitrary.

In Massachusetts there was a reasonable and uniform basis of distribution based in proportion to the real and

personal property contained in the several municipalities, although it is true that the amount distributed was not in proportion to the amount raised.

## FINDINGS AS TO EFFECT OF SECTIONS SIX, SEVEN AND EIGHT.

By the provisions of Article XII, Section 2, of the Ohio Constitution, as amended, the state is given authority to tax property "for all state and local purposes." Therefore, in the fundamental law of this state there is recognized the two distinct purposes for which the state may levy and distribute taxes.

Further, this constitutional provision does not authorize the method of distribution adopted by Sections 6, 7, and 8, *supra*.

We therefore find:

FIRST: The levy under the Intangible Tax Law having been found to be constitutional and valid, there is no inconsistency (nor doubt of the right of this Court) in declaring the distribution features therein invalid and unconstitutional.

SECOND: Plaintiff herein, as the Prosecuting Attorney of this county, had the right and duty to file this action.

THIRD: This tax, by the express wording of this legislation, is local in its purposes.

Therefore, the taxes collected in one community for local purposes cannot be distributed to another community for purely local purposes.

FOURTH: Assuming that this were a state tax, under Section 6 of the Act, under consideration, the state would be assuming debts of cities or townships, which would violate Article VIII, Section 5 of the Ohio Constitution.

FIFTH: Sections 6, 7 and 8 are arbitrary, unreasonable and unjust in their application; they are temporary in their operation and appear to be of an experimental nature. We are not holding, however, that upon distribution to the several counties there must be absolute uniformity as to proportions to amounts collected, but there must be some reasonable and just basis for a distribution of this sort.

SIXTH: These sections are not based upon any uniformity of application, in that no attention has been paid to different tax rates in different cities in arbitrarily fixing the personal tax levy of 1930 as the basis upon which to arrive at the quota of the different subdivisions under these sections.

## CONCLUSIONS THAT SAID SECTIONS SIX, SEVEN AND EIGHT ARE UNCONSTITUTIONAL AND VOID.

We, therefore, find it to be our solemn duty to and we do hereby declare Sections 6, 7 and 8 of the Ohio Intangible Tax Law, known as Amended Senate Bill 323, invalid and void, because they, and each of them, are in direct conflict with the following provisions of the Ohio Constitution:

Article I, Section I, because the citizens of the several subdivisions of this county and state are being deprived by the operation of these Sections, 6, 7, and 8, of property rights guaranteed by this section of Article I.

Article II, Section 26, because this being a law of a general nature, it must have uniform operation throughout the state.

Article X, Section 5, because no money can be drawn from the county treasury, as is attempted here.

Article X, Section 7, because the county commissioners having been given the power of local taxation herein, the state is without power to force such commissioners, contrary to law, to abandon their authority.

Article XII, Section 5, because although this tax is levied in pursuance of law, nevertheless, in the distribution features (Sections 6, 7 and 8,) the General Assembly is attempting to do indirectly what it is prohibited from doing directly.

Article XII, Section 11, because under Sections 6, 7 and 8, there is no provision by which there is assured the collection annually of amounts sufficient to pay the interest on the bonded indebtedness of the different political subdivisions and to provide a sinking fund for their final redemption at maturity.

### THE PETITION DOES NOT STATE FACTS SUFFICIENT TO ALLEGE A VIOLATION OF ARTICLE XIV, SECTION I, OF THE AMENDMENTS TO THE UNITED STATES CONSTITUTION.

With reference to the alleged violation of Article XIV, Section I, of the Amendments to the United States Constitution, it is our opinion, and we so find, that the petition which we have before us does not, with sufficient certainty, set forth an agreed plan by which there is an attempted discrimination against the taxpayers of Hamilton County. Therefore, we find that there is not alleged in the Petition facts sufficient to permit this Court to find that there is a violation of the said Fourteenth Amendment of the Federal Constitution.

### AS TO THE INTERVENING PETITION OF THE BOARD OF TRUSTEES OF THE PUBLIC LIBRARY OF CINCINNATI.

With reference to the prayer in the Intervening Petition of the Board of Trustees of the Public Library of Cincinnati, inasmuch as their claims, of necessity, are based upon said Sections 6, 7 and 8, there is no other alternative for the Court than to deny the same. The rights of the Public Library of Cincinnati must be protected, in our judgment, either by an action in mandamus or by appeal to the General Assembly.

### DEMURRERS TO PETITION AND MOTIONS TO DISSOLVE TEMPORARY RESTRAINING ORDER, OVERRULED.

It follows, therefore, that the Demurrers to the Petition herein must be, and hereby are, overruled. The Motions to dissolve the temporary restraining order heretofore issued by Judge Stanley Matthews of this Court, are hereby overruled.

Entries should be presented accordingly.